## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

BEVERLY JORNIGAN, DWIGHT WARD,
and JON MORAN,

      Plaintiffs,

vs.                                        No. CIV 03-0813  JB/ACT

NEW MEXICO MUTUAL CASUALTY COMPANY,
and WARREN SMALLEY, JOHNNY SUAREZ,
PAUL CANNIZARRO, DEBORAH PAYNE,
KAREN ALARID, RAYMOND PEROVICH,
TED KNIGHT, BILL GARCIA, FABIAN CHAVEZ,
CHARLES DUKE COLKETT, RON MOSHEL,
BRIAN STOKES, NESTOR ROMERO, and
ERIC SERNA, in their individual capacities,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Motion for Summary Judgment of

Defendants Nestor Romero and Eric Serna, filed April 9, 2004 (Doc. 69).  The primary issue is

whether Defendants Romero and Serna are entitled to qualified immunity from the Plaintiffs' Equal

Protection and Due Process claims.  Because the Court finds that both Romero and Serna are entitled

to qualified immunity, it will grant the motion and dismiss the Plaintiffs' claims against these two

defendants with prejudice.

## FACTUAL BACKGROUND

New Mexico Mutual Casualty Company ("NMMCC") is an insurance company that the New

Mexico Legislature created in the New Mexico Employers Mutual Company Act to provide workers'

compensation insurance coverage to New Mexico businesses.  See NMSA 1978 § 52-9-1 to § 52-9-

25 (2003 Replacement Pamphlet).  The State regulates NMMCC in the same manner it regulates private insurance companies.  <u>See</u> NMSA § 52-9-21 ("The insurance operations of the company are subject to all of the applicable provisions of the Insurance Code in the same manner as those provisions apply to a private insurance company.").  NMMCC and its president have many of the same powers as their private counterparts.  <u>See</u> NMSA §§ 52-9-15 and 52-9-16.

The Plaintiffs are former NMMCC executive officers and employees.  Beverly Jornigan was Executive Vice President and Chief Operating Officer.  Dwight Ward was Chief Financial Officer. Jon Moran was Chief Technology Officer.

Serna was, during a portion of the time period at issue, the superintendent of the Insurance Division of the New Mexico Public Regulation Commission.  The superintendent manages the New Mexico Department of Insurance ("DOI").  The Legislature has statutorily empowered the superintendent, as often as he deems advisable, to examine the accounts, records, documents, transactions, and affairs of insurance companies transacting business in New Mexico, of their subsidiaries, and of persons having contracts to control an insurer or produce substantially all of an insurance company's business.  <u>See</u> NMSA § 59A-4-4 (2000 Replacement Pamphlet).

The Legislature has also empowered the superintendent to examine any matter that he, in his sole discretion, determines to be relevant to an insurer's financial affairs.  <u>See</u> NMSA § 59A-4-5(A). "Except as expressly otherwise provided, the superintendent shall so examine each domestic insurer not less frequently than every five years."  <u>Id.</u>

> In scheduling and determining the nature, scope and frequency of the examinations, the superintendent may consider such matters as the results of financial statement analyses and ratios, changes in management or ownership, actuarial opinions, reports of independent certified public accountants, evidence of market practices, policyholder complaints and other criteria as set forth in the handbooks for financial

or market conduct examiners adopted by the national association of insurance commissioners in effect when the superintendent exercises discretion under this section.

Id.  At all relevant times, the National Association of Insurance Commissioners Handbook for Financial or Market Conduct Examiners included, among the criteria for market conduct exams, inquiries into the details of any employment or other contracts insurance companies have with employees.  See Affidavit of Eric Serna ¶ 5, at 2 (executed April 8, 2004).  The purpose of this criterion is to allow the examiner to form a judgment whether such contracts' terms and provisions adversely affect policyholders, shareholders, or the public.  See id.

Romero, at all relevant times, was a Certified Public Accountant and a Certified Financial Examiner.  During the period of time at issue in this lawsuit, Romero worked as an examiner for Entellus Consulting, Inc., a private corporation that contracted with the New Mexico Department of Insurance to conduct financial examinations of insurance companies.  See Affidavit of Nestor Romero ¶¶ 4, at 1 (executed April 5, 2004); Corrected Affidavit of Eric Serna ¶ 5, at 2 (executed May 17, 2004).  Romero currently works for RL Regulatory Consultants, Inc., a private corporation that performs contract services for the DOI.  See Romero Aff. ¶ 2, at 1; Corrected Serna Aff. ¶ 5, at 2.  The Legislature has authorized such contracts.  See NMSA § 59A-4-6(B).

In 2000, the superintendent of the DOI instructed Entellus to conduct a regular five-year examination of NMMCC (the "periodic examination").  At that time, Don Letherer was the superintendent.  See Romero Aff. ¶ 5, at 1; Corrected Serna Aff. ¶ 3, at 1.  The Legislature requires the DOI to conduct such examinations.  See NMSA § 59A-4-5(A).  Romero was one of the examiners.  See Romero Aff. ¶ 6, at 2.  He was not the Examiner-in-Charge.  See id.

The periodic examination of NMMCC looked back to the period ending December 31, 1998.

-3-

The periodic examination pertaining to NMMCC for the period 1994-1998 was critical of the company in a number of particulars.  <u>See</u> Serna Aff. ¶ 8, at 3.  Although the Plaintiffs in this lawsuit each had an employment contract with NMMCC during the period under examination, there was no criticism in the report of the employment contracts in effect during that period. <u>See</u> <u>id.</u>

The employment contracts were not at issue during the periodic examination.  <u>See</u> Corrected Serna Aff. ¶ 4, at 2; Romero Aff. ¶ 7, at 2.  Romero does not recall seeing the employment contracts during the periodic examination.  <u>See</u> Romero Aff. ¶ 7, at 2.  The Plaintiffs dispute whether Romero saw the contracts during this examination, but state that they need additional discovery regarding the extent of Romero's involvement in the periodic examination.

In late 2000, NMMCC entered into new employment contracts with the Plaintiffs.  <u>See</u> Employment Agreements of Beverly Jornigan, Dwight Ward, and Jon Moran.  These contracts were effective October 1, 2000 and, by their terms, would remain in effect until October 1, 2003.  <u>See</u> <u>id.</u> These contracts did not exist during the course of Entellus' examination of NMMCC earlier in the year 2000.  Even if they had existed at the time of the periodic examination, the 2000 contracts would not have been germane to an inquiry into NMMCC's business in the period 1993-1998.

The employment contracts came to Serna's attention in the period of 2001-2002 when state legislators serving on the Legislative Finance Committee raised concerns about unusually high salaries being paid to NMMCC employees, which gave the appearance of jeopardizing NMMCC's financial stability.  <u>See</u> Serna Aff. ¶ 9, at 3.  Specifically, members of the Legislative Finance Committee expressed concerns to Serna that employees had received employment contracts that generated unusually high commissions and bonuses based on sales of insurance policies in connection with Foundation Reserve Insurance Company, a subsidiary of NMMCC.  <u>See</u> <u>id.</u>; Romero Aff. ¶¶ 10-11,

at 2.[1]  Based on these concerns, Serna retained Entellus in February of 2002 to conduct a target examination of NMMCC and Foundation Reserve Insurance Company covering the period of January 1, 1998 to July 31, 2002.  See Serna Aff. ¶ 9, at 3; Corrected Serna Aff. ¶ 5, at 2; Romero Aff. ¶ 9, at 2.

A target examination is a special examination conducted at the discretion of the superintendent.  The superintendent has the statutory authority to conduct such examinations in addition to statutorily mandated five-year market conduct examinations.  See NMSA § 59A-4-5.  Romero was the Examiner-in-Charge of the examination team.  See Romero Aff. ¶ 11, at 2.

Entellus conducted the target examination as requested.  It took several months to complete and was conducted on-site at NMMCC's offices in Albuquerque, New Mexico.  See Romero Aff. ¶ 12, at 2.  During the target examination, Romero's team of examiners found and examined the executive employment contracts in question.  See id. ¶ 21, at 4.  No one from NMMCC or Foundation Reserve Insurance Company requested a hearing during the target examination.  See id. ¶ 23, at 4.

During August of 2002, Romero prepared a draft report regarding the target examination and submitted it to Serna.  See id. ¶ 13, at 2.  The draft report was strongly critical of the employment contracts.  See Serna Aff. ¶10, at 3-4.  NMMCC did not file the contracts with the DOI until after Serna received Romero's draft report.  See id. ¶ 11, at 4; Romero Aff. ¶ 17, at 3.

After studying Romero's draft report, Serna believed that it was accurate.  See Serna Aff. ¶ 12, at 4.  Serna adopted the report on October 7, 2002, and made it an official record with the

---

[1] The Plaintiffs dispute these allegations.  They did not, however, submit evidence to the Court to contradict them.  The Plaintiffs contend that they require additional discovery on this issue.

Insurance Division.  See Certificate, dated October 7, 2002.[2]  By adopting the target examination report, Serna formally disapproved of the Plaintiffs' employment contracts.  Neither the Plaintiffs nor any other NMMCC representative requested a hearing regarding Serna's decision to disapprove the contracts.  See Serna Aff. ¶ 13, at 5.

The report contained the following findings which are relevant to this motion:

(i) All five of NMMCC's executive officers, Warren Smalley, Jornigan, Ward, Moran, and Patricia McCarthy, had employment contracts for the period of July 1, 1997 through October 1, 2000 with NMMCC which provided that they would receive additional compensation of ten percent of base salary for Foundation Reserve duties.  See Report at 5.  In addition, for each $3.5 million gross written above the $3.5 million base premium amount, each of them would receive a ten percent increase in compensation.  See id.

(ii)  NMSA § 59A-34-17(A) states:

No domestic insurer shall make, amend or renew any contract whereby any person is granted or is to enjoy in fact the management of the insurer to the material exclusion of its board of directors or to have the controlling or preemptive right to produce substantially all insurance business for the insurer, or, if an officer, director or otherwise part of the insurer's management, is to receive any commission, bonus or compensation based upon the volume of the insurer's business or transactions, unless the contract is filed with and not disapproved by the superintendent.

Id. at 5.

(iii) Jornigan-Armijo's, Ward's, Moran's, and Patricia McCarthy's employment contracts entitle the officers to compensation based upon Foundation Reserve Insurance Company's premium volume, but were not filed with the superintendent.  See id.  As such, there appears to be a violation

---

[2] Romero attached a copy of the adopted target examination report to his affidavit.  The Plaintiffs do not dispute the report's authenticity.

of NMSA § 59A-34-17(A).

(iv) NMMCC simultaneously filed the 1997 employment contracts with the superintendent when it responded to the draft of Romero's target examination report.  See id. at 6.

(v) The superintendent disapproved Jornigan's, Ward,'s Moran's, and McCarthy's 1997 employment contracts in their entirety.  See id.

(vi) In 2000, NMMCC renewed the five executive officers' employment contracts.  Each contract contained the following compensation language:

> In addition to salary currently being received for duties performed by employee as an officer of New Mexico Mutual Casualty Company, Southwest Casualty, and Risk Watch, additional compensation shall be given reflecting the additional duties, responsibilities and liabilities for work performed on behalf of Foundation Reserve Insurance Company.  This additional compensation is determined by the following benchmark: Employee shall receive a bonus equal to 10% of salary (not to include performance incentive pay) when Foundation Reserve Insurance Company's in force premium volume reaches $17.5 million.  Thereafter, Foundation Reserve Insurance Company shall reward employee with a bonus equal to 10% of present salary for every $3.5 million increase in in force premium above the base $17.5 million as stated in Foundation Reserve's monthly financial statements.

Id. at 6.

(vii) The 2000 employment agreements appeared to be a violation of NMSA 1978 § 59A-34-17(A) because they entitled the officers to compensation based on the premium volume of Foundation Reserve and had not been filed with the superintendent.  See id. at 7.

(viii) NMMCC filed their new employment contracts, i.e., the ones effective 2000, with the superintendent as part of their response to the draft of Romero's target examination report.  See id.

(ix) The superintendent disapproved the 2000 employment contracts in their entirety.  See id.

(x) The five officers (including the Plaintiffs here) were paid a total of $995,938.00 as a result of the incentive clauses in their employment contracts, while Foundation Reserve recorded a net loss

of $5,618,164.00, most of which occurred in 2002. See id. at 7-8.

(xi) NMMCC's net-to-gross premium ratio decreased significantly beginning in 1998 as a result of a change in Foundation Reserve's reinsurance program, which came into effect in 1998. The reinsurance program enabled Foundation Reserve to increase its amount of gross written premium significantly, as its net-premium-ratings-to-surplus ratio would not increase to levels that would have initiated regulatory action. See id. at 8.

(xii) NMSA § 59A-34-44 requires domestic insurers to report a material change in ceded reinsurance programs within fifteen days after the end of the calendar month in which the change occurs. Foundation Reserve did not submit this material change in reinsurance to the superintendent as required. As such, there appears to be a violation of NMSA § 59A-34-44. See id. at 8.

(xiii) Under the compensation formula contained in their employment contracts, the Plaintiffs' total compensation for the years 1998-2001 was such that, in the year 2001, NMMCC paid Jornigan $565,884.00, Ward $338,896.00, and Moran $283,577.00. See id. at 11.[3]

When Serna reviewed the 1997 and 2000 employment contracts that NMMCC filed simultaneously with its response to the draft report, he disapproved all of the contracts with the exception of Smalley's 1997 contract.

> Simultaneous with their response to the draft of this examination report, the Company filed the contracts of Beverly Jornigan-Armijo, Dwight Ward, Jon Moran, and Patricia McCarthy with the Superintendent. These contracts have been disapproved in their entirety . . . . Simultaneous with their response to the draft of this examination report, the Company filed the renewed employment contracts of Warren Smalley, Beverly Jornigan, Dwight Ward, Jon Moran, and Patricia McCarthy with the Superintendent. These contracts have been disapproved in their entirety.

---

[3] The Plaintiffs point out that Romero's and Serna's brief misstates the information contained in the compensation chart in the report. NMMCC paid Jornigan $460,107.00 in 2001. NMMCC paid Smalley $565,884.00 that same year.

Report at 6-7. The Plaintiffs have introduced evidence that Smalley's 1997 contract was filed with the superintendent as required by law and affirmatively approved by Chris Krahling, who was the superintendent at that time. See Letter from Chris Krahling, Superintendent of Insurance, to Whom It May Concern (dated November 17, 1997); Affidavit of Warren Smalley ¶¶ 8-10, at 2-3 (executed May 18, 2004).

There is evidence in the record that NMMCC was aware of the problem with the bonus provisions in the employment contracts before the target examination. Based on his conversations with DOI personnel, Smalley knew that the DOI believed that the contracts violated the New Mexico Insurance Code. See Smalley Aff. ¶¶ 12-13, at 3. After learning the DOI's position, Smalley, as the executive officer of the Board, unilaterally suspended those portions of the contracts. See id. ¶ 15, at 4; Minutes: Compensation Committee Meeting (August 14, 2001). Smalley communicated this action to personnel at the DOI. See Smalley Aff. ¶ 15, at 4 ("I informed the Insurance Department by letter to Mr. Ross on or about August 6, 2001 that I had suspended the portions . . . of the contracts that were of concern to him."). Later, the Compensation Committee unanimously accepted and ratified Smalley's actions. See Minutes: Compensation Committee Meeting (August 14, 2001).

After suspending the offending provisions of the contracts, the NMMCC Compensation Committee voted unanimously to "continue the remaining parts of the current employment agreement until a new employment agreement can be crafted, *except* that portion which relates to bonuses or stock options for the Officers." Minutes: Compensation Committee Meeting (October 31, 2001)(emphasis in original). The Board of Directors approved that decision.

> Ms. Tinajero discussed the severability clause in the contract and said the rest of the employment contract would stay in place with the ESOP and incentive section removed . . . . A motion was made by Deborah Payne to approve the resolution to

ratify the actions of the compensation committee and approve the continuance of the employment contracts absence the ESOP and key employee Bonus Plan. The motion was carried unanimously.

Minutes: Board of Directors Meeting (November 9, 2001). On or about December 11, 2001, NMMCC again informed personnel at the DOI that those provisions of the contracts were no longer in effect. See Smalley Aff. ¶ 16, at 4.

There is no evidence in the record that Serna was involved in these discussions between the DOI and NMMCC. According to Serna's affidavit, he did not learn of the employment contracts until legislators raised concerns regarding those contracts. See Serna Aff. ¶ 9, at 3; Corrected Serna Aff. ¶ 4, at 2. Romero learned of the suspensions of the bonus provisions when he reviewed pay records and Board of Directors' minutes during the target examination. See Deposition of Nestor Romero at 42:20 to 43:11 (taken May 14, 2004).

## PROCEDURAL BACKGROUND

The Plaintiffs have sued Romero and Serna under 42 U.S.C. § 1983. In Count II of the Complaint, the Plaintiffs contend that Romero and Serna violated their right to equal protection of the law by discriminating against Jornigan on the basis of her sex and the male plaintiffs because they supported Jornigan in her resistance to unwanted sexual overtures by Defendant Warren Smalley. In Count III of the Complaint, the Plaintiffs raise a procedural due process claim. They contend that Romero and Serna deprived them of their property interests in their employment contracts without due process of law.

Romero and Serna move the Court, pursuant to rule 56 of the Federal Rules of Civil Procedure, for entry of summary judgment in their favor. The Plaintiffs filed a motion requesting that the Court extend the time for them to file a response to Romero's and Serna's summary judgment

motion on the ground that they are currently unable to present facts essential to justify their opposition to the motion for summary judgment. See Motion to Stay Plaintiffs' Deadline to Respond to Motion for Summary Judgment Pursuant to Rule 56(F), filed April 26, 2004 (Doc. 79). Pursuant to rule 56(f), the Plaintiffs sought to engage in written discovery and take the depositions of Romero and Serna before responding to the motion for summary judgment.

At a hearing on the Plaintiffs' motion to stay the response deadline, the Court denied the motion with respect to Serna and granted the motion with respect to Romero. See Clerk's Minutes at 2, filed May 3, 2004 (Doc. 83). Accordingly, the Court ordered the Plaintiffs to respond to the motion for summary judgment with respect to Serna, and allowed limited additional discovery with respect to Romero. The parties agreed that the hearing scheduled for May 26, 2004 would be limited to arguments concerning Serna. Because the parties completed the necessary discovery quickly, however, the Plaintiffs responded to the summary judgment with respect to both Serna and Romero.

At the hearing on this motion, the parties originally limited their arguments to Serna. At the conclusion of the hearing, the Court gave its oral ruling with respect to Serna. The Plaintiffs then requested that the Court also rule on the portion of the motion concerning Romero. See Transcript of Motion Hearing at 66:17-24 (May 26, 2004)("Transcript").[4]

### QUALIFIED IMMUNITY AND SUMMARY JUDGMENT STANDARDS

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

---

[4] The Court's citations to the transcript refer to the Court Reporter's original, unedited version. Any finalized transcript may contain slightly different page and/or line numbers.

known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Once a defendant raises the qualified immunity defense, the plaintiff must "come forward with facts or allegations sufficient to show both that the defendant's alleged conduct violated the law and that [the] law was clearly established when the alleged violation occurred." Pueblo Neighborhood Health Centers, Inc. v. Losavio, 847 F.2d 642, 646 (10th Cir. 1988).  If the plaintiff meets this two-part burden, the defendant "assumes the normal summary judgment burden of establishing that no material facts that would defeat his claim for qualified immunity remain in dispute." Woodward v. City of Worland, 977 F.2d 1392, 1396-97 (10th Cir. 1992).

In ruling on a summary judgment motion, the Court examines the factual record and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  See Allen v. Muskogee, Oklahoma, 119 F.3d 837, 839-40 (10th Cir. 1997).  The Court's role on a motion for summary judgment is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  See Ulissey v. Shvartsman, 61 F.3d 805, 808 (10th Cir. 1995).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48 (emphasis in original).  "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be

counted." Id. at 248 (citing 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, at 93-95 (1983)).  If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate.  See Anderson v. Liberty Lobby, Inc. 477 U.S. at 249-50.

## LEGAL ANALYSIS

Because Romero and Serna have moved for summary judgment on the basis of qualified immunity, the Plaintiffs' first burden is to show that the alleged conduct amounts to a constitutional violation.  After reviewing the record before it, the Court does not believe that the Plaintiffs' allegations against Romero and Serna constitute equal protection or due process violations.  Accordingly, the Plaintiffs have not overcome the qualified immunity defense.  Romero and Serna are entitled to judgment as a matter of law, and the Court will grant summary judgment in their favor.

I.    **THE PLAINTIFFS' RULE 56(F) AFFIDAVIT DOES NOT PRECLUDE THE COURT FROM RULING ON THE MOTION FOR SUMMARY JUDGMENT.**

In their response in opposition to Serna and Romero's motion for summary judgment, the Plaintiffs argued that they are entitled to additional discovery under rule 56(f) of the Federal Rules of Civil Procedure.  Rule 56(f) provides that:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed. R. Civ. P. 56(f).  "The general principle of Rule 56(f) is that 'summary judgment [should] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.'"  Price v. Western Resources, Inc., 232 F.3d 779, 783 (10th Cir. 2000)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 250 n. 5).

Although the Plaintiffs cite several cases in support of their request for additional discovery, they do not cite any authority for the proposition that rule 56(f) negates the protection that qualified immunity affords government officials.  The Supreme Court of the United States has instructed district courts to be mindful that qualified immunity protects government officials from discovery.  See Harlow v. Fitzgerald, 457 U.S. at 817-18 ("[W]e conclude today that bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery . . . .  Until this threshold immunity question is resolved, discovery should not be allowed.").

Thus, the doctrine of qualified immunity requires courts to analyze requests for additional discovery somewhat differently than other types of cases.

> A district court has discretion to determine whether to allow additional discovery following the filing of a Rule 56(f) affidavit and the Rule 56(f) affidavit "should be treated liberally unless dilatory or lacking in merit."  Patty Precision v. Brown & Sharpe Mfg. Co., 742 F.2d 1260, 1264 (10th Cir.1984).  However, the district court's discretion is not without bounds, particularly when the summary judgment motion is grounded on a claim of qualified immunity:
>
>> Rule 56(f) discretion must be limited when a summary judgment motion is based on qualified immunity because insubstantial lawsuits "against government officials [should] be resolved prior to discovery and on summary judgment if possible."  Anderson v. Creighton, 483 U.S. 635, 640 n. 2 (1987) . . . .  Liberal application of rule 56(f) should not be allowed to subvert the goals of Harlow and its progeny.

Jones v. City and County of Denver, Colo., 854 F.2d 1206, 1211 (10th Cir.1988).

Lewis v. City of Ft. Collins, 903 F.2d 752, 758 (10th Cir. 1990).   "Rule 56(f) is not a license for a fishing expedition, especially when summary judgment is urged based on a claim of qualified immunity."  Id. at 759.  In response to a summary judgment motion based on qualified immunity, a plaintiff's rule 56(f) affidavit must demonstrate "'how discovery will enable them to rebut a

defendant's showing of objective reasonableness' or, stated alternatively, demonstrate a 'connection between the information he would seek in discovery and the validity of the [defendant's] qualified immunity assertion.'" Id. at 758 (quoting Jones v. City and County of Denver, Colo., 854 F.2d at 1211).

The Court does not believe that the Plaintiffs have made such a showing.  Serna's claim of qualified immunity is based on his assertion that it was objectively reasonable for him to order the target examination because of concerns that members of the Legislative Finance Committee expressed to him about executive employee compensation at NMMCC.  Romero's claim of qualified immunity is based on his assertion that he properly conducted the target examination as requested and reported accurate information to Serna.  And although the Plaintiffs request additional discovery regarding Serna's and Romero's "intent and their actions with regard to Plaintiffs' Contracts before, during, and after the target examination," Rule 56(F) Affidavit of Adam S. Baker ¶ 7(d), at 3-4 (executed May 24, 2004), there is no dispute that the 1997 and 2000 employment contracts contained volume based compensation provisions.  Because New Mexico law requires such contracts to be filed with the superintendent, Serna would have initiated the target examination and disapproved the contracts even if he knew NMMCC had suspended those provisions.  See Second Affidavit of Eric Serna ¶ 4, at 2 (executed May 17, 2004).  Thus, discovery showing whether Serna and Romero knew about the suspensions before the target examination would not rebut their showing of objective reasonableness.

Moreover, the Court does not believe the Plaintiffs have put forth an explanation why they have not yet conducted the discovery they contend is necessary.  Although the Court imposed a stay of discovery with respect to Serna on April 30, 2004, there were no limitations on discovery between February 4, 2004 and April 30, 2004.  Despite the ability to do so, the Plaintiffs did not serve

discovery on Serna and Romero until April 23, 2004.  See Certificate of Service, filed April 26, 2004 (Doc. 81).  Up until the Court's ruling on this motion, the Plaintiffs were free to conduct discovery regarding the state legislators who allegedly expressed concerns to Serna about the NMMCC employment contracts.  There was no stay as to that discovery.

The Court has allowed some discovery as to Romero.  Thus, the only discovery that the Plaintiffs' are precluded from pursuing is against Serna.  Because Serna has already introduced evidence into the record that he had no knowledge of the issues among the NMMCC employees, had no interest in the outcome of those issues, and that no one attempted to influence him in connection with the target examination, it is unlikely that discovery against Serna would reveal evidence that he intended to have the Plaintiffs fired.  See Serna Aff. ¶ 14, at 5.  Accordingly, the Court does not believe it is necessary or appropriate to delay ruling on this motion.  The record before the Court is proper, and the Court will rule on the motion for summary judgment.

## II.   SERNA IS ENTITLED TO QUALIFIED IMMUNITY FROM THE PLAINTIFFS' EQUAL PROTECTION CLAIMS AGAINST HIM.[5]

The basis of the Plaintiffs' equal protection claims against Serna is the allegation that he treated the Plaintiffs differently than he treated Smalley without any rational basis for doing so.  The Plaintiffs contend that Serna treated them differently from Smalley because of ill will toward the Plaintiffs based on Jornigan's sex and Ward's and Moran's support for Jornigan in her attempts to complain about sexual harassment and/or discrimination.  See Complaint ¶¶ 68-71, at 10-11.  Based

---

[5] Serna argues that he is also entitled to absolute immunity because he acted as an administrative judge when he reviewed and adopted the target examination report.  Because the Court finds that Serna is entitled to qualified immunity, it does not address the question whether Serna also enjoys absolute immunity from the Plaintiffs' claims.  At the hearing on this motion, counsel for Serna's counsel made it clear that, although he did not waive his absolute immunity defense, he viewed this case as one involving qualified immunity.  See Transcript at 27:22-23; 29:24 to 30:4.

on the record before the Court, Serna's only actions with respect to the Plaintiffs were ordering the target examination, adopting Romero's report, and disapproving the Plaintiffs' employment contracts. Serna did not place the Plaintiffs on administrative leave, and he did not ultimately fire them.

The Plaintiffs argue that summary judgment is inappropriate on the equal protection claim because Serna acted without any rational basis in disapproving the Plaintiffs' contracts. The Supreme Court of the United States has recognized that the Equal Protection Clause of the Fourteenth Amendment applies to claims brought by a "class of one," where the plaintiff alleges that he or she "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)(per curiam). Courts have upheld "class of one" cases, "in which a governmental body treated individuals differently who were identically situated in all respects rationally related to the government's mission." Indiana State Teachers Ass'n v. Board of School Com'rs of the City of Indianapolis, 101 F.3d 1179, 1181 (7th Cir. 1996)(citing Rubinovitz v. Rogato, 60 F.3d 906, 911-12 (1st Cir. 1995); Zeigler v. Jackson, 638 F.2d 776, 779 (5th Cir. 1981); LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980)). "While the principal target of the equal protection clause is discrimination against members of vulnerable groups, the clause protects class-of-one plaintiffs victimized by 'the wholly arbitrary act.'" Indiana State Teachers Ass'n v. Board of School Com'rs of the City of Indianapolis, 101 F.3d at 1181 (quoting City of New Orleans v. Dukes, 427 U.S. 297, 304 (1976)(per curiam)).

In this case, the Plaintiffs have not met their burden under the Olech standard. There is no evidence that Serna treated the Plaintiffs differently from others who were similarly situated. He disapproved every contract he reviewed that contained volume based bonus provisions and that had

not been filed with him.  Thus, with respect to individuals who were "identically situated in all respects rationally related to the government's mission," Serna's conduct was consistent.  The Plaintiffs have not introduced evidence regarding Serna's treatment of executive officers from other insurance companies that the Court could use to compare with the way he treated the Plaintiffs.

The only evidence of potential inconsistency is that the superintendent of the DOI approved Smalley's 1997 contract, which contained the same provisions as the Plaintiffs' contracts that Serna disapproved during the target examination.  There is no evidence, however, that Serna was involved in the approval of Smalley's 1997 contract.  Indeed the evidence is to the contrary.  Chris Krahling was the superintendent who approved Smalley's contract in 1997.  As far as Serna is concerned, the evidence before the Court is that he treated everyone equally; regardless of when the disapproval came or when they were filed, he did not approve of these contracts.

Moreover, Serna has been able to articulate a rational basis for his actions, and the Plaintiffs have not raised a genuine issue of fact as to that rational basis.  The members of the Legislative Finance Committee were complaining.  There was a target examination that revealed that the 1997 and 2000 contracts contained volume-based compensation provisions requiring that they be filed with the superintendent.  With the exception of Smalley's 1997 contract, NMMCC did not file the contracts for review.  The Court has already found that the 1997 and 2000 contracts were invalid. The Court believes there was a rational basis for Serna to both ask for a target examination and to disapprove the Plaintiffs' contracts.  The Court cannot say that Serna acted in a "wholly arbitrary" manner.  Indiana State Teachers Ass'n v. Board of School Com'rs of the City of Indianapolis, 101

F.3d at 1181.  Thus, the Court will dismiss the Plaintiffs' equal protection claims against Serna.[6]

## III.    SERNA IS ENTITLED TO QUALIFIED IMMUNITY FROM THE PLAINTIFFS' DUE PROCESS CLAIMS AGAINST HIM.

The basis of the Plaintiffs' due process claims against Serna is that he disapproved their employment contracts in their entirety without providing them with a hearing.  The Plaintiffs allege that they held a valuable property interest in their employment contracts.  See Complaint ¶ 75, at 11. The Plaintiffs contend that Serna deprived them of that property interest in two distinct ways: (i) failing to afford them a hearing; and (ii) disapproving the contracts in their entirety without a legal basis under New Mexico law.  See id. ¶¶ 77-78, at 12.

The Court has decided some of these issues in one of its earlier opinions in this case.  After reviewing the arguments of counsel, the briefing, the New Mexico statutes, and the Court's prior opinion, the Court does not believe that it is necessary to change its earlier rulings.  Accordingly, the Court incorporates the following portions of its prior opinion into this Memorandum Opinion and Order:

> The Court does not interpret the statute as requiring a hearing before the superintendent disapproves a contract that has not yet become effective.  The statute provides that:
>
> > The superintendent may, after a hearing held thereon, disapprove or withdraw his approval of **any such contract theretofore permitted to become effective or amended or renewed**, if he finds that the contract should be disapproved on any of the grounds specified in Subsection C of this section.

---

[6] To the extent that unresolved questions remain regarding whether Serna knew that NMMCC had suspended the volume-based compensation provisions of the 2000 contracts, those questions do not change the Court's result.  Serna disapproved the Plaintiffs contracts because NMMCC did not file them for his review at the time they were created, not because he believed the offending provisions were still in effect.  Indeed, Serna disapproved the 1997 contracts as well as the 2000 contracts, even though the 1997 contracts were no longer in effect.

NMSA § 59A-34-17(D)(emphasis added).  If the superintendent has allowed a contract to become effective, either by declining to disapprove it or affirmatively approving it, he must provide a hearing before disapproving or withdrawing his approval of the contract.  This portion of the statute does not apply to this case, because the superintendent was not dealing with a contract that he had previously "permitted to become effective."  Id.

No provision of the statute appears to require a hearing before the superintendent disapproves a contract he is reviewing for the first time.  Subsection A of the statute, which establishes the requirement of superintendent review of contracts containing provisions for volume-based compensation, does not mention a hearing.  Instead, the last sentence of that subsection requires only that "[a]ny disapproval shall be delivered to the insurer in writing stating the grounds therefor."  NMSA § 59A-34-17(A).

Memorandum Opinion and Amended Order at 17, filed April 19, 2004 (Doc. 78).  Thus, the Court does not believe that state law required Serna to provide the Plaintiffs with a hearing before disapproving their employment contracts.

The Court has also issued a ruling on the issue whether Serna acted outside the scope of New Mexico law when he disapproved the Plaintiffs' employment contracts in their entirety.  The Court stated in its earlier opinion that:

With respect to the Plaintiffs' allegation that Serna lacked a statutory basis to disapprove the Contracts in their entirety, the Court does not believe that § 59A-34-17 limits the superintendent by allowing him to disapprove only the volume-based compensation provisions themselves.  While it is true that those provisions trigger the applicability of the statute, the language of the statute contemplates disapproval of the contract rather than disapproval of the offending provision.  See NMSA § 59A-34-17(C)("The superintendent shall disapprove any such contract . . . if he finds that the contract [meets certain criteria].")(emphasis added).  Thus, the Court finds that the superintendent did not exceed his statutory authority by disapproving of the Contracts in their entirety.

Id. at 16-17.  Thus, the Court does not believe that Serna lacked a basis in law for disapproving the Plaintiffs' contracts in the manner he did.

At the hearing on this motion, the Plaintiffs argued that, even if state law does not require a

-20-

hearing, Serna was required to provide the Plaintiffs with a hearing under federal law. This argument assumes that the Plaintiffs had a protected property interest in their employment contracts. The Court has held, however, that the 1997 and 2000 employment contracts were void and unenforceable. See id. at 13. Because Serna disapproved of contracts that contained volume based compensation provisions, the Plaintiffs did not have any property interest, and federal law thus did not require a hearing.

To the extent that the Plaintiffs are alleging that Serna disapproved their reformed contracts that existed after NMMCC suspended the offending provisions, there is no evidence in the record to support that contention. The target examination report states that Serna disapproved of the 1997 and 2000 contracts that contained volume based compensation provisions and had not been filed for his review. See Report at 5-7. Because the reformed contracts did not contain those provisions, Serna did not attempt to disapprove those contracts. Even if he had attempted to do so, his attempt would have been ineffective, as he did not have authority to disapprove of such contracts.

The essence of the Plaintiffs' argument is that they had a right to continued employment under their reformed contracts. If that is the case, Serna did not take that right away; NMMCC did.[7] If the link is that Serna had some intent to accomplish the Plaintiffs' terminations, the rule 56(f) affidavit is inadequate to delay a ruling because there is no evidence in the record to support that theory. Accordingly, the Court will dismiss the Plaintiffs' due process claims against Serna.

## IV.   ROMERO IS ENTITLED TO QUALIFIED IMMUNITY FROM THE PLAINTIFFS' CLAIMS FOR THE SAME REASONS AS SERNA.

Romero's primary argument in support of summary judgment is that he is not a state actor

---

[7] To the extent the Plaintiffs have rights under their reformed contracts, the Court has left their breach of contract claims against NMMCC intact.

and therefore not subject to suit under § 1983.  Because Romero relied on his status as a private party, the Court allowed the parties to engage in limited discovery on that issue.  That discovery is complete.

Because the parties still dispute whether Romero is a state actor, the Court will assume for the purposes of this motion that Romero is a state actor rather than engaging in an unnecessary constitutional analysis.  At the hearing on this motion, the Plaintiffs admitted that they do not have any facts that distinguish Romero from Serna with respect to the existence of a constitutional violation.  See Transcript at 67:5-9.  The Court thus granted Romero's motion for summary judgment for the same reasons that it relied upon in granting Serna's motion.  Romero's conduct was objectively reasonable, and there is no evidence that Romero's conduct during the target examination was improperly motivated.[8]

**IT IS ORDERED** that the Motion for Summary Judgment of Defendants Nestor Romero and Eric Serna is granted.  The Court will dismiss all claims against Romero and Serna with prejudice.

_____
UNITED STATES DISTRICT JUDGE

---

[8] The Court stated on the record at the hearing on this motion that it was granting summary judgment as to Romero for the same reasons that it granted the motion as to Serna.  The Plaintiffs did not raise any additional arguments or objections.  See Transcript at 67:5-16.

Counsel:

Paul J. Kennedy
Mary Y.C. Han
Adam S. Baker
Kennedy & Han, P.C.
Albuquerque, New Mexico

    *Attorneys for the Plaintiffs*


Geoffrey D. Reider
Travis G. Jackson
Wayne R. Suggert
Maestas, Rieder & Suggert, P.C.
Albuquerque, New Mexico

- and -


John Wentworth
Jerry Todd Wertheim
Jones Snead Wertheim & Wentworth, P.A.
Santa Fe, New Mexico

    *Attorneys for the New Mexico Mutual Casualty Company Defendants*


John B. Pound
Herrera Long Pound & Komer P.A.
Santa Fe, New Mexico

    *Attorneys for Defendants Nestor Romero and Eric Serna*